# IN THE COURT OF APPEALS OF IOWA

No. 16-1051
Filed August 31, 2016

**IN THE INTEREST OF A.S. Jr.,**
**Minor child,**

**D.S., Mother,**
    Appellant,

**A.S. Sr., Father,**
    Appellant.
_____

Appeal from the Iowa District Court for Polk County, Susan C. Cox, District Associate Judge.

A mother and father appeal separately the termination of their parental rights to their child. **AFFIRMED ON BOTH APPEALS.**

Karmen R. Anderson, Des Moines, for appellant mother.

Kevin E. Hobbs, West Des Moines, for appellant father.

Thomas J. Miller, Attorney General, and Janet L. Hoffman, Assistant Attorney General, for appellee State.

Nicole Garbis Nolan of Youth Law Center, Des Moines, guardian ad litem for minor child.

Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**POTTERFIELD, Presiding Judge.**

The mother and father appeal separately the termination of their parental rights to their child, born in 2014. The juvenile court terminated each parent's rights pursuant to Iowa Code section 232.116(1)(h) (2015), which allows the court to terminate when the child is under three years of age, has been adjudicated a child in need of assistance (CINA), has been removed from the parent's physical custody for at least six of the twelve preceding months, and cannot be returned to the parent's custody at the time of the termination hearing.

**I. Background Facts and Proceedings.[1]**

The family came to the attention of the Iowa Department of Human Services (DHS) in January 2015[2] due to allegations the mother was drinking heavily while caring for the child; the father had recently left the family home. At the time, the mother denied she had a drinking issue. DHS offered the mother voluntary services, but she did not complete a substance-abuse evaluation or participate in services.

On June 18, 2015, a concerned citizen called 911 after witnessing the mother's erratic driving. The child was in the car with the mother at the time. Police officers followed the mother for several miles with their emergency lights and sirens activated, but the mother failed to notice them. During this time, the mother reportedly struck a curb with her vehicle and once swerved into oncoming

---

[1] The mother's brief disputes many of the juvenile court's findings of facts, claiming the court either misstated or misremembered several things. On our de novo review, we find little error or mistake with the court's recitation of facts. We find the facts as follows.

[2] Various reports from DHS note the father was arrested for domestic violence against the mother in August 2014. Additionally, DHS and the juvenile court were involved with the father regarding two of his other children before becoming involved with this mother and this child.

traffic, only stopping when she reached her destination—the family home. The mother failed several sobriety tests before ultimately providing a breath test with a blood alcohol content (BAC) of .326. The mother questioned the accuracy of the result, and the officers allowed her to take a second test. The second test provided a BAC of .340.

On June 23, 2015, the child was removed from the parents' care and placed with the paternal grandmother under the supervision of DHS. The mother remained in jail on charges for OWI and child endangerment. The mother pled guilty to both charges and received probation; she was released from jail on July 30, 2015.

After leaving jail, the mother completed a substance-abuse evaluation and was diagnosed with "alcohol abuse moderate disorder." She began intensive-outpatient treatment. According to DHS's August 17, 2015 report to the court, the mother had also recently been given a list of local therapists. DHS indicated, "[The mother] is aware she needs to engage in therapy." The report also indicated, "Continuation of [the child] in the family home is contrary to [the child's] welfare due to the need for [the mother] to engage in substance abuse treatment and mental health therapy."

On August 28, 2015, following a hearing on the matter, the court filed a dispositional order, which stated in part, "The Court makes the following specific findings of fact: Mother has engaged in intensive outpatient treatment . . . . She needs to engage in therapy."[3]

---

[3] According to DHS's notices from an October 2015 family team meeting, the mother "agree[d] that she will look into therapy options, to resolve concerns of anger and to

The mother was successfully discharged from intensive-outpatient treatment in early September 2015 and began continuing care. According to the mother's testimony, she relapsed sometime in mid-November. She provided a "dirty" urinanalysis (UA) in early December, with a BAC of .209. At the termination hearing, the mother admitted for the first time that the positive UA was due to her consumption of alcohol.[4] The mother was discharged from continuing care on December 18, 2015, due to lack of contact for thirty days. Additionally, the mother chose to use a secure continuous remote alcohol monitor (SCRAM)—ostensibly to establish her sobriety to DHS. She began using the device, which required the mother to breathe into the device four set times per day, after her positive UA result. Two times in late December, once on the 24th and once on the 28th, the SCRAM indicated the mother had been drinking alcohol. The mother then missed several tests. She testified she accidentally left the device in her friend's car on the 28th, and the friend left the state with it. The juvenile court did not find this testimony credible.

On January 3, 2016, the mother was arrested for burglary in the first degree and assault causing bodily injury. The officer who responded to the call testified at the termination hearing; he stated he was dispatched "in regards to a burglary in progress involving three individuals that also mentioned a [T]aser." When he arrived at the scene, the officer learned the mother had come to the home to confront a juvenile over a gaming system that was allegedly stolen from

---

discuss coping skill so she is not sending messages or making phone calls that are not appropriate."

[4] The mother had previously claimed it was due to her use of a cold medicine that she was taking.

the mother. The confrontation became physical between the mother and the juvenile and then between the mother and the juvenile's mother. The officer identified abrasions on the victim and located a Taser on the enclosed front porch of the home where the scuffle had taken place. According to the officer's testimony, the juvenile's mother reported the mother "had attempted to force her way into her home several times, and then at one point produced a Taser and attempted to shock her with it." Additionally, the two minor children of the mother's former paramour were with her at the time the incident took place.

The mother remained in jail from January 3 to April 8, 2016—making the total time she spent incarcerated during the pendency of the case approximately five months. The mother pled guilty to assault causing bodily injury and the lesser charge of burglary in the third degree. She received two years of probation.

The first day of the two-day termination hearing took place on February 24. The mother attended. The father, who had not been in communication with DHS and had not been participating in services, came to part of the hearing on the first day. At the hearing, the mother testified. She admitted DHS had recommended she attend mental-health therapy as well as address her substance abuse. She claimed she never started therapy because she took a mental-health evaluation, and it did not recommend she attend. Additionally, the mother testified the father had been abusive toward her more than the one time he was arrested for it in 2014. When asked if the father had an "out of control" temper, she stated that he does "at times." The family safety, risk, and

permanency (FSRP) services provider testified that there were no concerns or issues with the mother's parenting when she was sober.

The second day of the termination hearing took place on May 16, 2016. The father did not attend. Although he had been recently arrested for possession of methamphetamine, he was not being held in jail at the time of the hearing.

At the hearing, questions arose regarding whether the mother and the father were in a relationship again. The mother admitted she had seen and communicated with the father since she was released from jail. She testified he had helped her move in to her new home and was helping make some necessary repairs. She denied they were romantically involved and she asserted she would keep the children from the father if necessary. However, the paternal grandmother testified she had seen the father leaving the mother's house that morning when she arrived to pick up the mother for the hearing. Upon further questioning, the grandmother testified she had not actually seen the father exiting the home, and it was possible she was confused or had misunderstood.[5]

The mother testified she had been sober since before her January 3 arrest. She was again wearing a SCRAM device, and she had not had any positive results. She had found employment she anticipated starting soon, and the home she moved into after being released from jail was considered appropriate by DHS. However, the mother had only recently started attending mental-health therapy to deal with her self-described anger issues and her

---

[5] In the termination order, the court noted, "During the grandmother's trial testimony, she often paused for significant periods of time and looked at the mother. It appeared that the grandmother repeatedly hesitated and attempted to not say anything to hurt the mother. The grandmother attempted to pacify the mother—in both mannerisms and content."

relationship issues, including her history of dating violent men. Her recent initiation of contact with the father and her concealment of their relationship—whether sexual in nature or not—belied her claims. Additionally, the mother restarted substance-abuse treatment on April 26, 2016. She was meant to attend group sessions twice each week. When the caseworker called the treatment center to ask about the mother's progress after the first two weeks, the mother's counselor reported she had missed two of the first four appointments. The caseworker did not have a report on whether the mother attended the two other sessions that took place after her call and before the hearing, but the mother stated she attended them.

On June 9, 2016, the juvenile court terminated the mother and the father's parental rights to the child, pursuant to Iowa Code section 232.116(1)(h).

The mother and father appeal separately.

**II. Standard of Review.**

We review the juvenile court's decision to terminate parental rights de novo. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). Our review involves a well-established three-step analysis:

> The first step is to determine whether any ground for termination under section 232.116(1) has been established. If we find that a ground for termination has been established, then we determine whether the best-interest framework as laid out in section 232.116(2) supports the termination of parental rights. Finally, if we do find that the statutory best-interest framework supports the termination of parental rights, we consider whether any exceptions in section 232.116(3) apply to preclude termination of parental rights.

*Id.* at 219–20.

**III. Mother's Appeal.**

The mother maintains the child could have been returned to her care at the time of the termination hearing. In the alternative, she maintains the court should have given her a six-month extension to work towards reunification, pursuant to Iowa Code section 232.104(2)(b). She also maintains termination is not in the best interests of the child and several factors in section 232.116(3) weigh against terminating her parental rights.

The mother maintains the child could have been returned to her care at the time of the termination hearing because she had been sober for over five months, had an appropriate home, a job, and an ongoing relationship with the child.

The mother was able to reestablish herself quickly after being released from jail. However, due to her incarceration, the mother was unable to establish that she could maintain sobriety outside of a structured environment. The mother was arrested and incarcerated for approximately five weeks at the beginning of the case. She then maintained her sobriety for less than four months before relapsing. Although she characterizes her relapse as "minor", in her testimony, the mother indicated she drank alcohol on at least four separate occasions[6] before stopping only after again being arrested and incarcerated. Additionally, the mother did not notify anyone when she relapsed in November 2015, and she did not seek help. Rather, the mother continued to lie about the positive tests, claiming they were in error. At the time of the second day of the termination

---

[6] The mother testified she initially relapsed in November. She also admitted that the various test results that showed she had been drinking on December 1, 24, and 28 were not in error.

hearing, the mother had maintained sobriety outside of jail for only approximately five weeks. In that time, the mother had missed at least two of the six scheduled sessions for substance-abuse treatment. We agree with the juvenile court that the child could not be returned to the mother's care at the time of the termination hearing.

In the alternative, the mother maintains she should have been given a six-month extension to work toward reunification with the child. At the second day of the termination hearing, the FSRP provider initially testified she would recommend a six-month extension for the mother to establish she could maintain her sobriety. However, the FSRP worker was unaware the mother had missed multiple treatment sessions and was again communicating and spending time with the father. The worker indicated she did not feel a six-month extension was appropriate if the mother was still involved with the father. Additionally, the caseworker in charge of the case from January 2015—during the voluntary stage—until March 2016 did not support the extension. We acknowledge the paternal grandmother has custody of the child and stated she would support a six-month extension. As the grandmother indicated, she would prefer if she could be "grandma" instead of "mom." However, a request for a six-month extension can only be granted if the court can make "the determination the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period." *See* Iowa Code § 232.104(2)(b). Here, we are not confident the reasons for removal will not continue to exist in six months. We are unsure of the mother's level of commitment to her recovery. Additionally, the

mother had only recently started attending therapy[7] and had not dealt with the source of her decisions to date violent criminals. The mother maintained she would keep the children from the father if DHS believed it was necessary, but we doubt her sincerity. When she was asked about his history of instability and violence, the mother defended the father, claiming he was fine when he was on medications and they "did really well as a married couple and as a family."

The mother maintains termination is not in the child's best interests. She argues it would be harmful to the child because the child is close to an older sibling,[8] and termination may sever that relationship. The record indicates the two children are closely bonded and their relationship is important to each child; we agree it is important they remain a part of each other's lives. However, we believe they will do so even if the mother's rights are terminated. The paternal grandmother and the older child's father have coordinated sibling visits throughout the case. There have been difficulties at times, but the paternal grandmother—who is willing to adopt the child if the mother's rights are terminated—testified she would continue those visits between the siblings.

The mother maintains there are two factors weighing against termination of her parental rights, the bond she and the child share, *see* Iowa Code § 232.116(3)(c), and the fact that the paternal grandmother has custody of the child, *see* id. § 232.116(3)(a). The application of the factors is permissive, not

---

[7] Although the mother testified at various times that she did not believe she needed therapy or that she was not required to attend it as part of the juvenile proceedings, on the second day of the proceedings, the mother admitted therapy had been recommended since disposition and that it "would be very beneficial for [her]."

[8] The older sibling is a child of the mother and a different father. The mother's rights have not been terminated as to the older sibling, who has been placed in the care of the father during the pendency of the case.

mandatory. *See In re P.L.*, 778 N.W.2d 33, 39 (Iowa 2010). Here, the juvenile court considered the factors and found that even though there is a bond between the child and the mother, the child's need for permanency and stability outweighs the possible harm from termination of the mother's parental rights. *See In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014) (citing *In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially) (noting the "defining elements in a child's best interest" are the child's safety and her "need for a permanent home")); *see also In re D.W.*, 791 N.W.2d 703, 709 (Iowa 2010) ("[O]ur consideration must center on whether the child will be disadvantaged by termination, and whether the disadvantage overcomes [the parent's] ability to provide for [the child's] developing needs."). We agree with the juvenile court that no permissive factor weighs against terminating the mother's parental rights.

**IV. Father's Appeal.**

The father maintains the State never established that the child had been removed from his physical custody. Additionally, he maintains the child could have been returned to his care at the time of the termination hearing. Finally, he maintains that a permissive factor of section 232.116(3)(a)—a relative having legal custody of the child—weighs against the termination of his rights.

The father maintains the child was never removed from his physical custody. The father had moved out of the marital home and had not had contact with the child for several months when the juvenile court became involved with the family in June 2015.[9] Notwithstanding, we note the father was sent an

---

[9] Another panel of our court recently considered the meaning of "physical custody" within section 232.116(1)(f). *See In re C.F.-H.*, No. 16-0918, 2016 WL 4379340, at *2–3 (Iowa

"original notice and notice of hearing and summons" for the removal hearing. The father chose not to attend the hearing; the court noted in the removal order that he was "not present and not participating in DHS case for his other children." We find no merit in the father's assertion that the child was not removed from his physical custody.

Next, the father maintains the child could have been returned to him at the time of the termination hearing, or in the alternative, that a six-month extension to work toward reunification was warranted. The father did not attend the second day of the termination hearing. He had not been in contact with the FSRP worker for an extended period of time, and he was not participating in services. The father had been previously diagnosed with bipolar disorder and borderline personality disorder. There was no evidence he was taking his medication as prescribed; the paternal grandmother testified she did not believe he was compliant with his medications because she had not seen him in approximately thirty days and "[u]sually when he's not doing the right thing, that's when I don't see him." The father's psychiatrist told the FSRP worker he was unable to care for children, due to being mentally unstable. The father had also recently been charged with possession of methamphetamine. Additionally, although he had a history of domestic violence, insofar as DHS was aware, the father had not

---

Ct. App. Aug. 17, 2016). In *C.F-H.*, the panel found the child had been removed from the physical custody of the father, as required by section 232.116(1)(f), because even though the court had not entered a removal order, the father had not lived in the family home with the mother and the child for at least twelve of the last eighteen months. *See id.* at *3; *compare* Iowa Code § 232.116(1)(f)(3) ("The child has been removed from the *physical custody* of the child's parents for at least twelve of the last eighteen months . . . ."), *with* Iowa Code § 232.116(1)(h)(3) ("The child has been removed from the *physical custody* of the child's parents for at least six months of the last twelve months . . . .") (emphasis added).

participated in services to address his issues. The child could not be returned to the father's custody at the time of the termination hearing, and there is no evidence to support that an extension was warranted.

The father also maintains termination of his rights is not in the child's best interests. Although the father had recently been having visits with the child under the paternal grandmother's supervision, the father initially failed to stay in contact with the child after he left the family home. When the paternal grandmother was asked about the father's apparently violent temper, she testified, "If I was a kid and seen some of the actions of the anger when it comes out, I think they would feel they are in danger. . . . If you asked the kids if he was in one of those rages, I'm sure they would say they didn't feel safe." When she was asked if the child would be in actual danger from the father, she responded, "In my profession when there's mental issues, you don't—you can't second guess." For these reasons, we believe termination of the father's parental rights is in the child's best interests.

Lastly, the father maintains that a permissive factor weighs against termination—namely that his mother has legal custody of the child. *See* Iowa Code § 232.116(3)(a). After reviewing the record in its entirety, we agree with the juvenile court that the permissive factor should not be applied in this case.

**V. Conclusion.**

For the reasons explained above, we affirm the termination of the mother's and the father's parental rights, pursuant to Iowa Code section 232.116(1)(h).

**AFFIRMED ON BOTH APPEALS.**